Mr. Ahmad, this is Julia Gibbons, I'm the judge presiding over this panel and I'm here with Judges Merritt and McKeague. You may know this, Mr. Trishler, your adversary, chose to be in the courtroom so he is here seated at the council table. People usually don't have any trouble knowing if I'm the one asking the questions but I imagine that Judges Merritt and McKeague will identify themselves if they have questions. Did you want to reserve some time for rebuttal? I did, Your Honor. I will be reserving five minutes for rebuttal. Alright. With that, you may proceed. Thank you, Judges. Good morning. My name is Jay Ahmad. I represent the estate of Beth Ann Kelly in this matter. This is a case, as the judges are aware, which involves the death of Ms. Kelly, a 44-year-old deceased woman who died of a fentanyl intoxication through the use of a single fentanyl patch which was manufactured by the defendant. She was using the patch as prescribed and as instructed. And it is plaintiff's allegation, the appellant's allegation in this matter, that the patch manufactured by the defendant was defectively designed or manufactured which led to the excessively lethal dose of fentanyl into Ms. Kelly's system, causing her death. The single question, as the court is well aware at this point, is whether or not the defendants, as the manufacturers of this product, enjoy protection under Michigan's Drug Product Immunity Law, codified under MCL 600.2946, subsection 5. It is plaintiff's allegation that this patch falls outside the definition of a drug as, again, is defined under the Drug Product Immunity Law. And the Drug Product Immunity Law in Michigan does not specifically define drug but rather references us to the Federal Food Drug and Codicide Act, 21 U.S.C. 321. Counsel, this is Judge Merrick. Can I ask you sort of to get to the point that I'm concerned about? Are you aware that in 1990 Congress amended the Federal Act to add a third category of products known as combination products? And so the dual, the problem of just two choices, either a drug or a device, to that we have to add presumably the question of whether this is a combination product. Are you aware of those three items, the distinctions there? Well, I'm aware of the regulation of combination products as it's referenced in the Act under 21 U.S.C. 353. And I think what that does, Judge, to sort of emphasize what your point is, that you're right. It's not just for some products, that is, is this a drug, is this a device? What I think the combination product section, again, emphasizes is that a product such as this can have components of both. And if the plaintiffs in this case were alleging that the drug component of this product, the fentanyl, were defective or dangerous, then I would agree and likely never would have brought this to action because drugs, as we understand that term through the Federal Act, are, again, immunized here in Michigan. So if the case were fentanyl is dangerous and defective, this case would not have been brought. But that's not what happened in this case. Ms. Kelly did not die as a result of a therapeutic level of fentanyl. She died because the delivery system by which fentanyl was, again, delivered into her system was defective. Because this is a combination product. There's the drug, fentanyl, and then there's the manner by which it is delivered, this transdermal delivery system, which was defective, either in its manufacture or its design. And that is the nub of plaintiff's allegation in this case, is that, yes, this is a combination product. There are components of it that are clearly a drug, the fentanyl being one. But that is not what plaintiff's allegation is. We do not allege that fentanyl is a dangerous, unreasonable drug. And it's therapeutic doses. It's very helpful to people who have chronic pain syndrome as an opioid analgesic. Mr. Ahmad, this is Judge McKeague. You really are not directly addressing Judge Merritt's question here. You don't premise your claim on it being a combination drug or product as far as I understand it. But when you respond to his question, wouldn't every drug become a combination product based on what you just said? Because I don't know any drug that can be administered without the aid of something that is used to administer it. Well, I guess I don't agree with that respectfully. I think if you take a tablet of aspirin, just to use an easy example, that is something taken and there is no quote-unquote delivery system. You swallow it and it's metabolized and it works pharmacologically through your system in that fashion. Here, the deceit did not – I'm sorry, was someone asking a question? No. Okay. The drug is not consumed or, you know, it wasn't just taken in a manner in which there is a normal sense of taking a drug. It's delivered here through a delivery system. And it's that delivery system that was defective. If the system works, you would only have a therapeutic level in your blood system. In this case, as pointed out in my brief, Ms. Kelly's blood level of fentanyl was exponentially above the therapeutic level because the delivery system failed in this manner. Counsel, the problem I have is your briefing of this case is such that you seem to think that the question is whether this is a device or a drug. And the federal statute seems to provide for three different possibilities. The last one is whether it's a combination product, which you don't mention or explore in your brief. And rather than thinking that you waived it, we're having this argument to determine what is your position about whether this is a combination product, a device, or a drug, or what? I guess for purposes of this case, my sole argument is that it's not a drug. The issue in this case concerns the non-drug product in this patch. It doesn't matter for purposes of the drug product immunity law in Michigan whether, to me, it's a combination or a device. It only matters if it's a drug or a non-drug. Does this case involve the drug component of this patch, which it does not? Again, the plaintiff does not allege that the drug, fentanyl, is defective. I don't think you understand the question I'm asking you. I apologize, your honor. I'm trying to. I'm not being deliberately evasive. The choice we have here is to say this is not a drug because it is a device. This is not a drug because it is a combination product, or this is a drug. And you don't brief the alternatives that we, that you just say, well, it's not a drug, but there's more to the analysis than that. Do you follow me? I do. And if I missed that point in my brief, then... Well, maybe you could address it right here. Do you think it's a combination product? I do, and I don't know that there's a, respectfully, that there's a way to disagree with that, because it obviously has a fentanyl component, and then there is the delivery system for the fentanyl. So, I think respectfully that it is a combination product, but which again highlights the idea that there are separate components of products such as this, such as this patch, which is made up of the fentanyl reservoir, and then the method by which it is delivered, which is what we contend was defective. What do you make of the FDA letter approving the fentanyl patch that uses the word drug? Yeah, I mean, looking at the statute, it says, you know, regulation products are going to be approved by the agency center charged with either pre-market review of drugs or pre-market review of devices or pre-market review of biological products. The job, as I understand it reading the statute, is for the agency to determine what's the primary function of it. Is it a biological product? Is it a drug? Is it a device? In this case, the FDA determined, well, this is mainly a drug, so we're going to have it approved by the drug subcenter. But that's, again, that's not what we're alleging in this case. We're alleging that the delivery system was defective. Well, I guess it's more a question of what weight, if any, is to be given to the FDA letter of approval in deciding how to classify this patch. Well, I think that the Michigan Drug Product Immunity Law only references the statute of how drugs are defined under the Federal Food and Drugs and Cosmetic Act, not, you know, how the FDA, you know, writes a letter to someone. I mean, they specifically reference this statute. And that's what we look to determine. Is what's being alleged in this case a drug under this particular definition as quoted in page 14 of my brief? And, again, I would respectfully submit that that's not the allegation. That's not the defect. We do not claim that fentanyl was dangerous or defective. We claim that the manner by which it was delivered in this case was defective, resulting in this extraordinarily lethal dose in this delivery system. Well, I think at least I was hoping you'd be able to address, Mr. Ahmad, so I'll give you a chance now on this aspect of it. In addition to the letter from the FDA saying it's a drug, the letter comes from a specific division of the FDA. And the way I understand the process, the FDA determines which office is going to regulate that product depending on what they determine it to be. And if a manufacturer thinks they have a combination product, they ask for a designation, and if it's granted, it goes to a certain office, not the one that issued this letter. So the way it works in practice, if I understand it correctly, seems to suggest that in addition to saying it's a drug, the office that it came from indicate it's a drug. So if it's a drug, what would be the basis of us now saying, for purposes of Michigan law, no, it's not a drug, it's either a device or a combination product? Well, because I think if we look at, again, 21 U.S.C. 353 sub G1, it says, under the regulation of combination products, the secretary shall determine the primary mode of action of the combination product, because they have to decide one or the other. But that doesn't mean that there isn't another component of it. It's just that the secretary has to decide what's the primary mode of action. Here they said, well, we think the primary mode of action is the drug, but that doesn't mean that there's not a delivery system component of it. It's just the secretary felt that the primary mode was the drug, which I don't necessarily disagree with, but that doesn't diminish the fact that there's still a delivery system, which must function appropriately. Mr. Ahmad, I'm not sure you don't have the capability of seeing. He does. He does? He knows that his time is out. Okay. Well, no, no, you're answering questions. I'm just trying to ascertain if the panel has any more questions at this point, and if not, we will have your rebuttal time. All right. Thank you, Your Honors. All right, Mr. Trischler. May it please the Court, my name is Clem Trischler. I represent Mylan Technologies, Mylan Pharmaceuticals, and their parent corporation, Mylan Inc. Mylan Technologies and Mylan Pharmaceuticals are the manufacturer and distributor of the Mylan Fentanyl Transdermal System, an FDA-approved drug product that has provided therapeutic benefit to millions since the time of its approval in 2005. I think I should start by addressing the questions that have been posed by the panel, and specifically on September 25 the panel issued a letter asking the parties to be prepared to argue and address the question of whether the Mylan Fentanyl patch is a combination product, and if so, what impact that has on the Michigan immunity statute. And as Judge Merritt pointed out, at no time in the underlying case, at no time in their brief to this Court did the appellant ever argue that the Mylan Fentanyl patch was a combination product that fell outside the scope of the immunity statute. I believe raising it now for the first time at oral argument in response to questions and an invitation posed by the Court constitutes a waiver. But be that as it may, in addressing the issues raised by the Court, I submit that the Mylan Fentanyl patch is not a combination product, as that term has been defined by the FDA. The definition appears at 21 CFR section 3.2, and the FDA has defined a combination product as a product comprised of two or more regulated components. FDA regulates drugs, they regulate devices, and they regulate biologics. In order to have a combination product, you need a drug and a device, a drug and a biologic, a biologic and a device. You have to have two regulated components. And when you look at the Mylan Fentanyl patch, based on the evidence that's in the record in this case and based on the scientific characteristics of the property, it is nothing more than a drug. What about the listing of transdermal patches on the FDA website? Is it referring to some sort of patch other than the one at issue in this case? I think I know what Your Honor is referring to when this issue was raised. Actually, it's specifically on the website, combination products are defined, or I don't know if definition might, but they're listed. Transdermal patches are listed as combination products. That's what I'm trying to say. I've navigated the FDA website, and I am aware that if you went on the website, you would see some patch products listed as combination products. For instance, I think one of them talks about a fentanyl patch that works through ionophoresis, which I'm probably going far beyond my technical expertise, but ionophoretics deals with electronic stimulation of the skin to stimulate drug delivery through the skin to try and defeat the barrier properties of the skin. When you're talking about ionophoretics, you're dealing with both a device and a product. You have to go back to the definition, and the definitions define a drug basically as a chemical that has its mechanism of action through chemical action in the body or metabolic action. That's a drug. A device is specifically defined as a regulated component that operates through something other than chemical action or metabolic process. The myelin fentanyl patch operates only through the process of molecular diffusion to deliver fentanyl through the skin barrier layers into the bloodstream where it's metabolized and has its effect on the body. To ascertain this from the record, where would we look? In the record in this case, Your Honor, since the issue of whether or not it's a combination product is one that's raised for the first time on appeal, I'm not sure where you'd find it in the statutes. Where you would find it is the definition of a combination product at 21 CFR Section 3.2 and the definition of drugs and devices. This comes to us based on the dismissal of a complaint, right? That is correct. For the precise moment, I don't know if the cases start to run together in terms of the record after a while, but I'm not aware that there was any evidentiary record in this case. The only record was that it was submitted on a motion to dismiss under Rule 12b-6. The court properly considered the FDA approval letter in 2005, which Your Honor has previously mentioned. This documentary evidence that was attached to the complaint. Correct, but there was no other evidentiary hearing. You're correct, Your Honor. Well, not only not a hearing, but this is not a summary judgment motion that was determined based on an evidentiary record, whether there was a hearing or not. That's correct, but I would submit it's a pure question of law as to whether the product meets the definition of a drug, which it clearly does. The way a product works is not... Why don't we say, for example, that the patch that delivers to the body the drug is like an IV? It delivers to the body through similar mechanisms a drug. Why isn't the patch like an IV? I submit it is, Your Honor. This has a different route of administration. Your example would be fentanyl delivered intravenously. There are still inactive components in that solution. The example offered by appellant's counsel of your Tylenol capsule or tablet... What holds the drug that's delivered to the body in an IV situation? You wouldn't say the IV device itself is a drug, would you? I would not say that the needles that are injected into the vein are a drug, but the solution itself is. In this case, the patch is nothing more than a piece of plastic adhesive that holds the fentanyl. Isn't it designed to deliver the drug into the body according to certain timing? What delivers the drug into the body is the size of the patch and the process of molecular diffusion because the rate of drug diffusion across the skin is determined by the surface area. Doesn't the patch itself determine in some way how much of the drug is actually delivered? Only the size because it is the surface area that controls the rate of drug delivery across the skin. All the patch does, the silicone-based adhesive, all it does is hold the drug in place. It's the size that determines the rate of drug delivery. The size of the patch. Yes, sir. You're saying the patch itself doesn't regulate the amount of drug that's dispensed. That's correct. It's the interaction of the drug itself up against the skin. And if you have a little bit of it, you get a little dispersal. You've got a lot of it, you get a lot. That is essentially correct, Your Honor. If the size of the patch determines how much of the drug is delivered, why doesn't the patch itself have something to do with the problem in this case which is alleged? That is that for some reason or other, the size of the patch was such that it delivered, according to the allegation and the complaint, too much of the drug. If that were the allegation in this case, then perhaps the size of the patch might have something to do with it. But, again, the size of the patch, the dosage form, in this case a transdermal patch, it still makes it a drug. You have to look to federal law under the Michigan statute for the definition of a drug. A drug includes its inactive components. Every drug product made has an active pharmaceutical ingredient and inactive components that aid in its delivery, whether it be a coated capsule, whether it be a tablet, whether it be a patch in this case. They all include inactive ingredients. And the federal law says that those inactive ingredients are part of the drug. It's defined at 21 U.S.C. Section 321. And to the point that the Court raised a little bit earlier, there's ample information in this record for the Court below to have made the determination as a matter of law that the Myelin-Fentanyl patch is a drug. First, we have the FDA approval letter. And I neglected to mention that also part of the record below is the FDA-approved labeling instructions for this product,  That information is the only information submitted in the record. It's more than ample information for the Court to have made the legal determination that it is a drug. I would point the Court also to the Supreme Court's... Does the idea that it's regulated as a drug necessarily mean it is a drug for purposes of the Michigan statute? I would say... I mean, a combination product has got to be regulated in some way. My understanding of the scheme is you would regulate it after making a decision about whether it should be regulated as a drug or regulated as a device. And so the decision of how to regulate does not necessarily seem to be the same thing as defining something as either a drug, a device, or a combination product. I would submit that the FDA's determination that the Myelin-Fentanyl patch is a drug is determinative. The Supreme Court said back in 2011... The FDA didn't look at this and ask the question, Is this a drug per se? Is this a combination product? It didn't ask that question. It absolutely did. Wait a minute. That's not the task the FDA is performing. The FDA is deciding how it should be regulated. If it's not a drug, the FDA can't regulate it at all. They obviously have to determine it's a drug. Right. They could regulate it as a biologic. They could regulate it as a medical device. They concluded that it's a drug. And they approved it as a drug. They approved it under 21 U.S.C. 355, the provisions for drug approval. Let's assume the FDA thinks it's a combination product. Then how would it determine... Would it be regulated as a combination product? Or would they call it either a drug or a device or biologic or whatever? If the FDA concluded that it was a... The label of combination product that was created a few years ago by the FDA was one that was created solely for purposes of determining which center within FDA would have primary jurisdiction over the premarket approval process. FDA has a center for biologics. Devices are approved through the CDRH, Center for Devices and Radiologic Health. And then drugs fall under the jurisdiction of CDRH, the Center for Drug Evaluation and Research. So what the FDA said in defining combination products... Does it have a separate center for combination products? One, two, three, either it's a drug, it's a combination product, it's a device or something else? They then look at the primary mode of action. If the primary mode of action is drug related, it's referred for premarket approval to CDRH, where CDRH, the Center for Drug Evaluation and Research, has to determine whether it's safe and effective and it has to approve it under 21 U.S.C. section 355, which is the process that the myelin fentanyl patch underwent. And so I would submit to the second question that the court asked back in September 25 with its letter to the parties, does it make a difference whether it's a combination product or not? The answer to that question is no, because what matters is not what it's labeled. What matters is how is it approved. And the myelin fentanyl patch was approved as a drug, and the Michigan legislature has made a policy decision that drugs that undergo the rigorous approval for safety and efficacy are entitled to immunity because we are not going to ask lay jurors to substitute their judgment for the expertise of the FDA in deciding that this product is safe and effective. And so whether it's a drug or a combination product, I submit it's a drug, but what label you put to it ultimately doesn't matter. What matters is how is it treated and how is it evaluated by FDA. This was evaluated as a drug. It underwent the rigorous process for review of safety and efficacy that drugs undergo. An approval letter was issued saying this drug is determined to be safe and effective, and the Michigan legislature said that process having been undertaken, the manufacturer has been deemed by our legislature to have acted reasonably and prudently, and we are not going to let tort liability lie in that situation, in that circumstance. You refer to the term combination product as if it's some sort of designation for the FDA's administrative convenience. In fact, it's in the statute, isn't it? It is. And it's also in the regulations. It has real status as a category. It's not just an administrative labeling. It's a category to define which center has primary jurisdiction over that product. You think that's why Congress put it in the statute? I do. There's no separate provision in the FDA for approval of combination products. Well, we're sort of back to it's regulated as one or the other, and the FDA makes that call. That doesn't necessarily mean that it is what it's regulated as. It's regulated and approved as a drug in this case, or other products may be regulated or approved as devices, and having been regulated or approved as a drug, and with Michigan law looking to the FDA definition of a drug as controlling. It just seems to me that the more appropriate argument is that the immunity from liability under Michigan law was intended to encompass anything that is regulated as a drug. I don't disagree with that position. That just seems to me a more analytically direct path than the one you suggest. The path you just outlined is the path I was trying to articulate. Well, I'm not sure that what I said is correct, but it just seems to me that's an easier way to get there if one wants to get there. My position essentially is I was trying to first address the court's question about whether this is a combination product. I don't think it is because it doesn't meet the definition of a device. It only meets the definition of a drug. But if it is a combination product, the immunity still lies because it was regulated and approved as a drug, and the intent of the legislature was to provide immunity for that. That's my position. We'll hear from Mr. Ahmad in rebuttal. Thank you for your time. Thank you, Your Honors. I'll try and be brief. What I heard from my opponent respectfully was a lot of fact discussion about how the fentanyl transdermal delivery system works. And as the justices pointed out, this was dismissed on a Rule 12 motion. There was zero discovery. I didn't even get answers to analogicals or get to take a single deposition to ask anybody, how does this product work? How does the fentanyl get into the system? What are the manufacturing methods by which we determine how this drug is going to get into the system? So I am handicapped in terms of arguing about this as a device, a combination product, or a drug, because I was permitted no discovery in this case to ask those very questions to the people who know the answers. And so I would suggest at minimum this is a case that is ripe for discovery because there are fact issues. When I hear Mr. Trishler talk about how this product is delivered because it's based on the size of the patch and there's no real delivery system, I take issue with that. I disagree with that. There is a method by which this is delivered. It's not just the drug pressing against your skin. And that comes out in discovery. But, again, I wasn't permitted any of that. Counsel, this is Judge Merritt. Could I ask you, did you respond to the motion to dismiss in that way that this question is not ripe for decision because there are questions that need to be explored by deposition? I did, Your Honor, and I think that also was addressed in the oral argument below suggesting that there's a lot of fact issues here, especially when Mr. Trishler starts talking about the way in which this product works. And that is a factual dispute, which can be determinative on this immunity issue. Normally the way you would raise that, Counsel, is you'd file a Rule 26 or 27J letter. I think we might have changed the designation. 56. Is it 56J, something like that? Did you file one? Whatever it is, did you file one of those? I don't believe I did. But I do think in listening to argument there are fact questions about how this product works. But irrespective, as even Mr. Trishler acknowledged, this is a delivery system akin to an IV, and it's not the fentanyl that is at dispute in this case. It's the manner by which it's delivered. And it's not a factual dispute the excessive and lethal amount that was in Ms. Kelly's system when she passed away. And that doesn't get in the system by a normal, functioning, reasonable delivery system. It gets in there because the delivery system was defective, not the drug. Fentanyl didn't do anything to this patient to cause her to have an extraordinary blood level. It was the manner by which it was delivered. And that's the nub of the argument, is that this delivery system failed, which, as a combination with fentanyl, takes it outside the realm of exclusively and strictly a drug. Now, is it regulated, and was it approved as a drug? Yes. But as Judge Gibbons pointed out, that doesn't mean that it's strictly a drug as defined under U.S.C. 321. It only means that's how it's regulated because they had to choose one. So I think if you analyze what the actual allegations are in this complaint, they are not concerning the drug fentanyl, only the manner by which it's delivered, the manufacture of this delivery system. And I think that the case needs to be remanded back to the court for further discovery, and the trial court should be reversed in that manner, and that's what I would respectfully request. We thank you very much for your arguments, and we will consider the case carefully. And we thank you for preparing to give oral argument on shorter notice than we typically give. I believe none of the other cases are being argued, so you may adjourn court. This Honorable Court is now adjourned. One marker. I have a button. I'm going to come in. Let me just have my... All that stuff. You want to hold it? No, I need it. Do you think you can get the rest? Thanks. All right.